UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ELBECO INCORPORATED,                          :
                                              :        No. 5:15-cv-00318-JFL
                              Plaintiff,       :
              v.                              :
                                              :
NATIONAL RETIREMENT FUND,                     :
                                              :
                              Defendant.       :
_____

**<u>MEMORANDUM OPINION</u>**

**Defendant's Motion to Dismiss, ECF No. 13 – Granted**

**Joseph F. Leeson, Jr.**                                    **September 2, 2015**
**United States District Judge**

## I.      Introduction

        This matter comes before the Court upon consideration of Defendant National Retirement

Fund's Motion to Dismiss Plaintiff Elbeco Incorporated's Complaint. ECF No. 13. For the

reasons that follow, the Court will grant the Motion and will dismiss the Complaint without

prejudice.

## II.     Factual Background and Procedural History

        Plaintiff Elbeco Incorporated is a Pennsylvania corporation engaged in the uniform

manufacturing business.[1] Compl. ¶ 3. Plaintiff's president is David Lurio. Compl. ¶ 12.

Defendant National Retirement Fund ("Defendant" or "the Fund") is a multiemployer pension

fund plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). Compl. ¶ 4.

---

[1]      The facts are primarily from Plaintiff's Complaint and are assumed to be true for the purposes of this
Opinion.

Plaintiff employs members of two Joint Boards of the Workers United labor union: the Mid-Atlantic Regional Joint Board and the Chicago and Midwest Regional Joint Board (collectively, "the Union"). Compl. ¶ 5. Noel Beasley is the President of Workers United and both a trustee and the secretary of the Fund. Compl. ¶¶ 13-14. Harold Bock is the International Vice President of the Mid-Atlantic Regional Joint Board of Workers United and is also a trustee of the Fund. Compl. ¶¶ 13, 15. Together, they served as the Union's "chief spokesmen" during the Union's 2013-2014 negotiations with Plaintiff concerning a new collective bargaining agreement ("CBA"). Compl. ¶ 13.

Plaintiff began contributing to the Fund (including its predecessors) in 1972. Compl. ¶ 9. In November 2012, Plaintiff asked the Fund to provide it with an estimate of its withdrawal liability pursuant to the Multiemployer Pension Plan Amendments Act ("MPPAA").[2] Compl. ¶ 16. In January 2013, Defendant provided an estimate of $1,024,718. Compl. ¶ 18. In May 2013, Plaintiff requested an updated estimate of withdrawal liability; in July 2013, Defendant provided an estimate of $1,003,203. Compl. ¶ 19. "As part of [Plaintiff's] negotiations with the Union, [Plaintiff] . . . advised [Beasley and Bock] that [Plaintiff] was planning a complete withdrawal from the Fund pending and subject to collective bargaining." Compl. ¶ 13. Defendant, "and specifically Bock and Beasley, knew at least by October 2013 that the Fund was changing actuarial firms and/or its actuarial assumptions, and that the withdrawal liability assessments against [Plaintiff] would increase greatly for a withdrawal after 2013." Compl. ¶ 21. If the Fund "had timely notified Plaintiff in 2013 that the Fund was changing actuarial firms and/or its actuarial assumptions for withdrawals after 2013," or that "the withdrawal liability

---

[2]    As discussed in further detail below, an employer's withdrawal liability "is essentially equal to the employer's allocable share of the plan's unfunded vested benefits, subject to certain adjustments. . . . An employer's allocable share of these benefits is based primarily on the employer's proportionate share of contributions made to the Fund." Carl Colteryahn Dairy, Inc. v. W. Pa. Teamsters & Employers Pension Fund, 847 F.2d 113, 116 (3d Cir. 1988) (citations omitted).

assessments would increase for withdrawals after 2013," then Plaintiff "would have withdrawn from the Fund by December 31,2013." Compl. ¶ 23-24. However, Plaintiff "was not able to accomplish the withdrawal during 2013 as a result of intentional delaying actions" by Beasley and Bock with respect to the CBA negotiations. Compl. ¶ 25.

By letter dated January 13, 2014, Plaintiff requested another withdrawal liability estimate. Compl. ¶ 31. In March 2014, while awaiting the estimate results, Plaintiff forwarded to Bock and Beasley a proposed Memorandum of Understanding ("MOU") as part of the ongoing negotiations for a new CBA. Compl. ¶ 33. The MOU provided that Plaintiff "will no longer make contributions to the present National Retirement Pension Fund. The foregoing shall be subject to [Plaintiff's] receipt and approval of the amount of withdrawal liability proposed to be assessed by the Fund." Compl. ¶ 33. After receiving the proposed MOU, Beasley proposed to Lurio that Plaintiff remove the second sentence from the above-quoted language. Compl. ¶ 34. Beasley stated that Plaintiff should wait to receive the updated estimate of withdrawal liability before entering into the MOU and that if Plaintiff was satisfied with the updated estimate, then the parties could enter into the MOU. Compl. ¶¶ 35-36. Plaintiff agreed to Beasley's suggestion and advised Defendant's representative, David C. Sapp, "that per Beasley's suggested approach to resolving the withdrawal liability issue, as a condition to settling the negotiations for a new CBA, [Plaintiff] was now waiting to receive the updated estimate from the Fund prior to entering into the MOU and withdrawing from the Fund." Compl. ¶ 37.

On April 8, 2014, the Fund provided Plaintiff with an updated estimate of $913,970. Compl. ¶ 40. The following day, Plaintiff signed a revised MOU and forwarded it to Bock and Beasley; the revised MOU provided that Plaintiff would withdraw from the Fund following ratification of the MOU by Plaintiff's union facilities. Compl. ¶¶ 43-44. By early May 2014, the

final MOU was ratified by each of Plaintiff's union facilities and signed by Beasley and Bock. Compl. ¶ 47. On May 20, 2014, Sapp called Lurio and advised him that the Fund had changed its interest rate assumption from 7.5% to 3%. Compl. ¶ 50. This was "the first time that [Plaintiff] was given notice of the Fund's decision to change the interest rate assumption, change in actuary, or even that such a change was being considered by the Fund." Compl. ¶ 51. On June 9, 2014, Sapp wrote to Plaintiff, stating that Defendant had determined that Plaintiff incurred a complete withdrawal from the Fund effective June 1, 2014, and that the estimated withdrawal liability assessment was $3,027,697. Compl. ¶ 52. At that point, Plaintiff "was not able to change concessions it had made to the Union in connection with the Final MOU that was ratified by the Union," and it was not able to rescind its decision to withdraw from the Fund. Compl. ¶ 54; Pl.'s Mem. Supp. Resp. Def.'s Mot. 4, ECF No. 16-1. Plaintiff alleges, upon information and belief, that the Fund "made the decision to change its actuary in 2013" and "was aware of the change or anticipated change in interest rate assumptions for the Fund at least prior to the date of [Plaintiff's] and the Union's agreement to the Final MOU which included withdrawal from the Fund." Compl. ¶¶ 57-58.

In January 2015, Plaintiff filed the present Complaint, alleging counts of fraud, negligent misrepresentation, and equitable estoppel under federal common law and seeking declaratory and monetary relief against the Fund. Compl. ¶¶ 64-93. With respect to each of the counts, Plaintiff alleges that "[t]he Fund's representatives, including Bock, Beasley and Sapp, intentionally and fraudulently withheld information from [Plaintiff] insofar as they failed to advise [Plaintiff] that the Fund was contemplating and/or changing actuarial firms and its actuarial assumptions in 2014, and failed to advise [Plaintiff] that the withdrawal liability assessments would increase for withdrawals after 2013." Compl. ¶ 65. Further, Plaintiff alleges that Defendant "had a duty to

timely disclose to [Plaintiff] that the Fund was contemplating changes, including its actuary and actuarial assumptions, and a duty to timely disclose to [Plaintiff] that it had changed actuaries and actuarial assumptions." Compl. ¶ 66. According to Plaintiff, the Fund "knew that a delay of [Plaintiff's] withdrawal from the Fund until 2014 would greatly increase [Plaintiff's] withdrawal liability," and the Fund's "failure to timely advise [Plaintiff] of the contemplated change, and the change, in actuaries and actuarial assumptions was material to [Plaintiff's] decision to not withdraw from the Fund in 2013." Compl. ¶ 68-69. Plaintiff "relied to its detriment on the Fund's omissions, statements and actions insofar as [Plaintiff] did not withdraw from the Fund until 2014, thereby greatly increasing its withdrawal liability." Compl. ¶ 70. Moreover, "[i]n 2014, the Fund knew that [Plaintiff] was relying on the Fund's withdrawal liability estimates when [Plaintiff] agreed to the Final MOU with the Union and withdrawal from the Fund in 2014." Compl. ¶ 72.

Further, Plaintiff alleges that "[t]he Fund made a material misrepresentation to [Plaintiff] when the Fund advised [Plaintiff] on April 8, 2014, that the estimated withdrawal liability . . . was $913,970, since the Fund failed to disclose to [Plaintiff] the change in the Fund actuary and the change in its assumptions for calculating withdrawal liability." Compl. ¶ 74. Plaintiff alleges that "at the time the Fund advised [Plaintiff] on April 8, 2014, that the estimated withdrawal liability for [Plaintiff] was $913,970, the Fund knew about the change in the Fund actuary, the change in its assumptions for calculating withdrawal liability, and that the withdrawal liability would be greatly in excess of $913,970." Compl. ¶ 75. Plaintiff "relied to its detriment on the Fund's statements and omissions insofar as if [Plaintiff] had known about the change in actuaries and actuarial assumptions, [it] would have not withdrawn from the Fund in 2014, or agreed to the final MOU." Compl. ¶ 77.

In light of the above allegations, Plaintiff seeks a declaration that the amount of its withdrawal liability is $913,970, which is the figure cited in the April 2014 withdrawal liability estimate. Compl. ¶ 89. Concurrently with the present action, and pursuant to the MPPAA, Plaintiff has also initiated arbitration with the American Arbitration Association regarding the withdrawal liability assessment. Compl. ¶ 61. Plaintiff has requested that the arbitration be stayed pending this court action and contends that "[t]his court, and not the arbitrator, should decide the federal common law claims asserted in this complaint."[3] Compl. ¶ 62.

On March 20, 2015, Defendant filed the Motion to Dismiss under consideration here. Defendant argues that the Court should dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction in light of ERISA's mandatory arbitration provision. In the alternative, Defendant argues that the Court should dismiss the Complaint pursuant to Rule 12(b)(6) because Plaintiff has failed to state a claim for relief under federal common law. The Court held oral argument on Defendant's Motion on June 11, 2015.

## III.  Legal Standards

### A.  Motion to Dismiss under Rule 12(b)(1)

A district court considering a motion pursuant to Rule 12(b)(1) must first determine whether that motion presents a "facial" attack or a "factual" attack on the claim at issue "because that distinction determines how the pleading must be reviewed." Moore v. Angie's List, Inc., No. CIV.A. 15-1243, 2015 WL 4669209, at *1 (E.D. Pa. Aug. 7, 2015) (quoting Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014)). A facial challenge contests the sufficiency of the complaint because of a defect on its face—such as lack of diversity among the parties or

---

[3]      Plaintiff observes that "[s]ince this action was filed, the parties have entered into a Stipulation for a stay of the . . . arbitration, subject to certain conditions." Pl.'s Mem. Supp. Resp. Def.'s Mot. 3, ECF No. 16-1.

the absence of a federal question. Id. In a facial challenge, the Court must consider the allegations of the complaint as true and consider only those allegations in the complaint, and the documents attached thereto, in the light most favorable to the plaintiff to determine whether the plaintiff has sufficiently alleged a basis for subject-matter jurisdiction. Id. Thus, when confronted with a facial challenge, the Court applies the identical standard of review that it uses in considering a motion to dismiss under Rule 12(b)(6). Id. A factual attack, on the other hand, asserts that the factual underpinnings of the basis for jurisdiction fails to "comport with the jurisdictional prerequisites." Id. (quoting United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007)). Such an evaluation may occur at any stage of the proceeding, but only once the defendant has filed an answer. Id. Here, Defendant has not yet filed an answer, and the Court will accordingly review Defendant's Motion as a facial attack on Plaintiff's claim.

**B.**     **Motion to Dismiss under Rule 12(b)(6)**

The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)). This Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).

Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the

Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Court subsequently laid out a two-part approach to reviewing a motion to dismiss under Rule 12(b)(6).

First, the Court observed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive the motion; "instead, 'a complaint must allege facts suggestive of [the proscribed] conduct.'" Id.; Phillips, 515 F.3d at 233 (quoting Twombly, 550 U.S. at 563 n.8). While Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," was "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 556 U.S. at 678-79 ("Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citing Twombly, 550 U.S. at 555)); see Fed. R. Civ. P. 8(a)(2). For "without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips, 515 F.3d 224, 232 (citing Twombly, 550 U.S. at 555 n.3).

Second, the Court emphasized, "only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 678. Only if "the '[f]actual allegations . . . raise a right to

relief above the speculative level'" has the plaintiff stated a plausible claim. Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 555). This is because Rule 8(a)(2) "requires not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.'" See id., 515 F.3d at 234 (quoting Fed. R. Civ. P. 8(a)(2)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Detailed factual allegations" are not required, id. at 678 (quoting Twombly, 550 U.S. at 555), but a claim must be "nudged . . . across the line from conceivable to plausible," id. at 680 (quoting Twombly, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement,'" but there must be "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" Id. (quoting Twombly, 550 U.S. at 557)).

Independent of the standard governing motions to dismiss under Rule 12(b)(6), Rule 9(b) imposes a heightened pleading standard with respect to a claim of fraud. The first sentence of the Rule states that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Thus, "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). However, in applying the first sentence of Rule 9(b), "courts must be sensitive to the fact that its application, prior to

discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud." Christidis v. First Pa. Mortg. Trust, 717 F.2d 96, 99–100 (3d Cir. 1983).

## IV. Plaintiff has Failed to State a Claim upon which Relief may be Granted.

## A. Statutory Background

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "the Act"), 29 U.S.C. §§ 1381-1461, employers may make contributions to one or more pension plans on behalf of their employees who belong to a participating union. Flying Tiger Line v. Teamsters Pension Trust Fund of Phila., 830 F.2d 1241, 1243 (3d Cir. 1987). "Congress enacted [the] MPPAA in particular because it found that existing legislation 'did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans.'" Id. (quoting Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 722 (1984)). The MPPAA "addressed this problem by assessing such employers with withdrawal liability, defined in the statute as the employer's adjusted 'allocable amount of unfunded vested benefits.'" Id. (quoting 29 U.S.C. § 1381(b)(1)).

The Act provides "a series of complex formulas by which a withdrawal liability sum is to be calculated." Carl Colteryahn Dairy, Inc. v. W. Pa. Teamsters & Employers Pension Fund, 847 F.2d 113, 117 (3d Cir. 1988) (citing 29 U.S.C. § 1391). The Act also includes provisions for "the quick and informal resolution of withdrawal liability disputes." Flying Tiger, 830 F.2d at 1243.

> The Act requires a plan's trustees to determine initially whether a withdrawal has occurred. 29 U.S.C. §§ 1382(1), 1399(b)(1)(A)(i) (1982). When the trustees conclude that a withdrawal has taken place, they must then notify the employer of the amount of liability and demand payment in accordance with an amortization schedule. 29 U.S.C. §§ 1382(2), 1383(3), 1399(b)(1)(B) (1982). Thereafter, the employer may within 90 days ask the trustees to conduct a reasonable "review" of the computed liability. 29 U.S.C. § 1399(b)(2)(A)(i) (1982).

10

Id.

"If a dispute remains, either party may initiate arbitration proceedings." Id. The Act provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of . . . title [29] shall be resolved through arbitration. Either party may initiate the arbitration proceeding within [specified time periods]." 29 U.S.C. § 1401(a)(1). Although such disputes may ultimately be heard by a federal district court upon review of an arbitration proceeding, the "MPPAA's primary mandate for these disputes is plain: arbitrate first." Colteryahn, 847 F.2d at 117 (citing 29 U.S.C. § 1401(a)(1); Flying Tiger, 830 F.2d at 1248–49).[4]

## B.    The Court has Subject Matter Jurisdiction pursuant to 29 U.S.C. § 1451(a)(1).

Defendant argues that this Court lacks subject matter jurisdiction over the present dispute in light of the "arbitrate first" mandate of the MPPAA. Specifically, Defendant contends that the essence of Plaintiff's claim is a challenge to the Fund's determination of Plaintiff's withdrawal liability, and Plaintiff's only goal in this litigation is "that this Court recalculate [Plaintiff's] withdrawal liability to a lesser amount than the Fund's assessment." Def.'s Mem. Supp. Mot. 2, ECF No. 13. According to Defendant, this is "precisely" the type of grievance identified by the arbitration mandate of 29 U.S.C. § 1401(a)(1): a dispute regarding a determination of Plaintiff's withdrawal liability pursuant to 29 U.S.C. §§ 1381(a) and 1391.[5] Id. at 11. Defendant contends that Plaintiff's assertion of federal common law claims is an attempt to disguise the true nature of the case and to avoid arbitration. Id. at 15. Accordingly, Defendant argues that this Court should

---

[4]    "Regardless of whether the employer requests review by a plan's trustees or initiates arbitration, however, the employer must begin making interim payments of the withdrawal liability in accordance with the plan's schedule within 60 days of notice of liability." Flying Tiger, 830 F.2d at 1244.

[5]    Title 29 U.S.C. 1381(a) provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." Title 29 U.S.C. 1391 sets forth the "[m]ethods for computing withdrawal liability."

recognize that Plaintiff's action is in fact a dispute over the calculation of withdrawal liability, over which the Court lacks jurisdiction in the first instance. Id.

Plaintiff argues that under this Circuit's precedent, the arbitrate-first mandate is reserved for "technical calculation issues," and that the common law claims raised here are outside the technical expertise of the arbitrator and consequently are properly before this Court. Pl.'s Mem. Supp. Resp. Def.'s Mot. 14, ECF No. 16-1. In particular, Plaintiff argues that the Court should be guided by the Court of Appeals for the Third Circuit's decision in Colteryahn, in which the court held that under the federal common law of pension plans, "a defrauded employer has a cause of action for the return of any sums that were fraudulently assessed by a pension plan." Id. (quoting Colteryahn, 847 F.2d at 115).

In Colteryahn, an employer alleged that it had been fraudulently induced by a multiemployer pension fund to accede to a merger of the fund with another plan to which the employer belonged through a series of misrepresentations and concealments that violated ERISA and directly led to an improper assessment of withdrawal liability. Colteryahn, 847 F.2d at 115. The court considered the applicability of the arbitrate-first mandate, which as noted above applies to any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of title 29, and determined that these sections of ERISA are "technical provisions, describing how and when withdrawal liability is to be assessed" that "provide no basis for either adjusting or eliminating an assessment based on fraud or misrepresentation." Id. at 118-19. Accordingly, the employer's fraud, misrepresentation, and concealment claims did not constitute "the type of technical calculation issue that Congress explicitly reserved for MPPAA arbitration." Id. at 115. Rather, in contrast with the "highly technical MPPAA issues that the statute has assigned to arbitration," id. at 119,

the employer's fraud and misrepresentation claims "concern[ed] events external to the actual calculation of the assessments (e.g., representations made by the Fund to Colteryahn and the extent of Colteryahn's reliance on these representations)," id. at 123. Thus, the court held that the MPPAA did not "deprive[] the federal courts of the power to decide such claims in the first instance." Id. at 118. The court went on to find the jurisdictional basis for the employer's claims in 29 U.S.C. § 1451(a)(1), which provides that a "plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, . . . may bring an action for appropriate legal or equitable relief, or both." Id. at 120. The court found the substantive basis for the employer's claims in "a federal common law of pension plans under ERISA," observing that it would be "quite curious if Congress had given multiemployer plans the immense power . . . to assess upon a withdrawing employer a substantial penalty while providing the employer with few defenses—yet did not intend to place some check on the conduct and practices of such plans." Id. at 121. Further, observing that it is "axiomatic that, as a general rule, a party should not be allowed to profit from its own wrongs," the court stated that it doubted "Congress intended that innocent employers, penalized by the fraudulent exercise of such [immense] powers, would be without remedy." Id.

Defendant contends that the holding in Colteryahn is limited to cases in which a plaintiff alleges that it was fraudulently induced to join a pension plan. Def.'s Mem. Supp. Mot. 14. However, the Court agrees with Plaintiff that Colteryahn is not so limited and that the decision applies more generally to cases in which, as here, a plaintiff raises claims of fraud and misrepresentation that "concern events external to the actual calculation of the assessments" – in this instance, Defendant's alleged failure to advise Plaintiff of its change in actuaries and actuarial assumptions. See also Bd. of Trustees of Trucking Employees of N. Jersey Welfare

Fund, Inc. - Pension Fund v. Centra, 983 F.2d 495, 507 (3d Cir. 1992) (rejecting an unduly

"expansive reading" of 29 U.S.C. § 1401(a)(1)). Accordingly, "[t]he Court concludes, based on

the reasoning of [Colteryahn], that these claims of misrepresentation are sufficiently removed

from the arbitrable issues of assessing withdrawal liability that the Court is able to address the

claims prior to arbitration." See EUSA-Allied Acquisition Corp. v. Teamsters Pension Trust

Fund of Phila. & Vicinity, No. CIV.A. 11-3181, 2012 WL 1033012, at *6 (D.N.J. Mar. 26,

2012).

**C.      The Court Will Dismiss Plaintiff's Fraud and Negligent Misrepresentation Claims
         without Prejudice.**

        Defendant contends that "[e]ven assuming, arguendo, that the Court has subject matter

jurisdiction to hear this dispute . . . it should still dismiss the Complaint because Plaintiff has

failed to state a claim for relief." Def.'s Mem. Supp. Mot. 16. With respect to Plaintiff's fraud

claim, Defendant contends that Plaintiff's claim must fail because "Plaintiff does not identify,

with particularity, any specific misrepresentation." Id. Nor, according to Defendant, is Plaintiff

able to support a claim of fraud by omission, because Plaintiff has failed to identify any "duty of

disclosure" that Defendant violated. Id. at 17. Further, Defendant contends that even if Plaintiff

had alleged that any of the withdrawal liability estimates were false or had identified a duty of

disclosure violated by Defendant, Plaintiff's fraud claim would still fail because Plaintiff cannot

show that it justifiably relied on any misrepresentation. Id. at 19. With respect to Plaintiff's

negligent misrepresentation claim, Defendant argues that this claim fails "[f]or the same reasons"

that Plaintiff's fraud claim fails. Id. Finally, with respect to Plaintiff's equitable estoppel claim,

Defendant argues that "no such claim exists." Id. at 20.

        Plaintiff does not allege or argue that Defendant made a positive misrepresentation.

Rather, Plaintiff alleges that Defendant committed fraud, negligent misrepresentation, and

equitable estoppel by omission when it failed to advise Plaintiff of its actuarial changes. Plaintiff alleges that Defendant's duty to disclose such changes arises from two sources: (1) Section 101 of ERISA, which imposes a "duty of disclosure and reporting" on plan administrators, and (2) a common law duty resulting from a relation of trust and confidence between the parties. First, with respect to Section 101 of ERISA, Plaintiff argues that Defendant had a duty to "provide accurate information" to Plaintiff, "including specifically explaining how the estimated liability amount was determined." Pl.'s Mem. 28. Plaintiff contends that "[b]y failing to advise [it] of the change in actuaries and actuarial assumptions, [Defendant] misrepresented [Plaintiff's] withdrawal liability" and thus violated its duty of disclosure. Id. Second, Plaintiff argues that Defendant had a duty to disclose under the common law, as described by the Restatement (Second) of Torts §551, Liability for Nondisclosure, which provides that "[o]ne party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . .  matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Id. (quoting Restatement (Second) of Torts § 551 (Am. Law Inst. 1977)). Plaintiff does not allege that it had a fiduciary relationship with Defendant under ERISA, but contends that the two parties were nevertheless in a "relation of trust and confidence" in which Defendant was bound to disclose information about its changes in actuaries and actuarial assumptions. Pl.'s Mem. 29.

In order to establish a common law fraud claim, a plaintiff must allege with particularity that: (a) the defendant made a misrepresentation to the plaintiff; (b) the misrepresentation made by defendant was fraudulent; (c) the misrepresentation was of a material fact; (d) the defendant intended that the plaintiff rely on the defendant's misrepresentation; (e) the plaintiff relied on the misrepresentation and (f) the plaintiff's reliance on the defendant's misrepresentation was a

substantial factor in bringing about the harm suffered by the plaintiff. <u>Fernander v. Amanze</u>, No. CIV.A. 02-603, 2007 WL 4083769, at *4 (E.D. Pa. Nov. 15, 2007). "An omission is actionable as a fraudulent misrepresentation where there is a duty to disclose." <u>Id.</u>[6] Common law claims of negligent misrepresentation by omission likewise require a duty to disclose. <u>See</u> <u>In re Access Cardiosystems, Inc.</u>, 404 B.R. 593, 643 n.69 (Bankr. D. Mass. 2009) (observing that a "duty to disclose" requirement "is found in both common-law fraud and negligent representation" claims). <u>See also</u> <u>Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.</u>, 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999) ("It is axiomatic, of course, that silence cannot amount to fraud in the absence of a duty to speak."). In short, in order for Plaintiff to state claims of fraud by omission and negligent misrepresentation by omission, Plaintiff is required to plausibly allege that (among other things) Defendant was under a duty to disclose the information in question.

In arguing for the existence of such a duty, Plaintiff relies first on Section 101 of ERISA, 29 U.S.C. § 1021, which sets forth a pension plan's "duty of disclosure and reporting" with respect to plan participants, beneficiaries, the Secretary of Labor, employers, and other entities. With respect to employers in particular, § 1021(*l*) provides that the sponsor or administrator of a multiemployer plan shall, upon written request, furnish to any employer who has an obligation to contribute to the plan a "notice of withdrawal liability." Specifically, the plan administrator is required to provide the following information:

> (A) the estimated amount which would be the amount of such employer's withdrawal liability under part 1 of subtitle E of subchapter III of this chapter if such employer withdrew on the last day of the plan year preceding the date of the request, and

---

[6]     In addition, the Court of Appeals for the Third Circuit has observed that in cases of "active concealment" a "duty to disclose is not always a required element of common-law fraud when there has been a material non-disclosure." <u>Sonneberg v. United States</u>, No. 01-2067, 2003 WL 1798982 (3d Cir. Apr. 4, 2003). Here, however, Plaintiff does not allege active concealment on the part of Defendant.

(B) an explanation of how such estimated liability amount was determined, including the actuarial assumptions and methods used to determine the value of the plan liabilities and assets, the data regarding employer contributions, unfunded vested benefits, annual changes in the plan's unfunded vested benefits, and the application of any relevant limitations on the estimated withdrawal liability.

29 U.S.C. §1021(*l*). Any required notice of potential withdrawal liability must be provided to the requesting employer within 180 days after the request is made. Id.

As described above, Plaintiff requested an updated withdrawal liability estimate from Defendant by a letter dated January 13, 2014, and Defendant provided the estimate by a letter signed by David C. Sapp and dated April 8, 2014, which is within the 180-day limit set by the statute. Compl. ¶ 31; Compl. Ex. D, ECF No. 1. In the letter, Sapp stated that Plaintiff's estimated withdrawal liability "for the plan year beginning January 1, 2013" was $913,970. Compl. Ex. D. Attached to the letter was a worksheet detailing the calculations used to reach this figure. Plaintiff is not challenging in this action the accuracy of the $913,970 figure or the calculations included in the accompanying worksheet.

Plaintiff points to the requirement in § 1021(*l*) that the plan provide an explanation of "the application of any relevant limitations on the estimated withdrawal liability" and suggests that Defendant did not provide a sufficient explanation of such limitations. Defendant argues that the "relevant limitations" to which the statute refers are limitations on the withdrawal liability and not limitations on the estimate thereof. Def.'s Reply Br. 7, ECF No. 17. In any event, even if "relevant limitations" is understood to refer to limitations on the estimate, Defendant's letter provided sufficient explanation of such limitations. Defendant's letter stated:

The actuarial assumptions and methodology used to calculate the estimate were the actuarial assumptions used to calculate withdrawal liability for employers withdrawing during the plan year ending December 31, 2013. The actuarial assumptions and methodology used to calculate [Plaintiff's] actuarial withdrawal liability for a withdrawal during the plan year ending December 31, 2014, and

subsequent years, may be different than those used for this estimate. This may cause [Plaintiff's] withdrawal liability to be materially different than this estimate.

Compl. Ex. D.

Plaintiff contends that Defendant's letter should have stated not merely that the actuarial assumptions and methodology for a withdrawal in 2014 "may" be different and that such differences "may" cause the withdrawal liability to be materially different, but that in fact the actuarial assumptions and methodology "would" be different and that such differences "would" cause the withdrawal liability to be materially different. Pl.'s Mem. 32. However, there is no basis for reading into the statute a requirement that a plan provide notice of current or future changes in its actuarial assumptions or methodology. Rather, as discussed above, the statute requires only that the plan provide the estimated withdrawal liability if the employer withdrew on the last day of the plan year preceding the date of the request, along with an explanation of how such estimated liability amount was determined. Accordingly, Defendant's failure to advise Plaintiff in the April 2014 notice letter of the alleged actuarial changes did not violate the requirements of § 1021(*l*).

Second, Plaintiff argues that under common law the two parties were in a "fiduciary relationship or other similar relation of trust and confidence" in which Defendant was required to inform Plaintiff of "matters known to [Defendant] that [Plaintiff] is entitled to know," including changes in Defendant's actuarial methods. As noted above, Plaintiff does not contend that it was in a fiduciary relationship with Defendant under ERISA, and indeed in Colteryahn the Third Circuit Court of Appeals clearly rejected the notion of such a relationship between a plan and employer, observing that "[f]iduciary duties under ERISA, as a general rule, are owed to participants and beneficiaries only," meaning that there can be no claim that a fund "acted in breach of a statutory fiduciary duty to act in the best interests of [an employer] . . . because [a]

Fund ha[s] no such duty." <u>Colteryahn</u>, 847 F.2d at 119. Moreover, courts have resisted attempts to create "a back-door way of imposing fiduciary responsibilities on trustees vis-a-vis employers." <u>Digeronimo Aggregates, LLC v. Zemla</u>, No. 1:13-CV-1208, 2013 WL 5781172, at *4 (N.D. Ohio Oct. 25, 2013), <u>aff'd</u>, 763 F.3d 506 (6th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 980 (2015); <u>see also</u> <u>Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.</u>, 148 F. Supp. 2d 60, 67 (D.D.C. 2001) ("Defendants argue that the trustees should waive these fees because of [employer's] extremely poor financial condition. Defendants are mistaken in asserting that the Trustees have a duty to help maintain the financial viability of a member employer."); <u>NYSA-ILA Med. & Clinical Servs. Fund v. Golten Marine Co.</u>, No. 91 CIV. 4707, 1994 WL 800706, at *7 (S.D.N.Y. Dec. 21, 1994) (finding that a pension fund "had no affirmative duty to inform defendant [employer] of the rate increase" with respect to contributions to the fund).

      Plaintiff argues that even if there was not a fiduciary relationship between the parties under ERISA, they were nevertheless engaged in a "similar relation of trust and confidence" in which Defendant had a duty of disclosure.[7] Under the common law, such relationships exist when "it appears that either one or each of the parties, in entering into the contract or other transaction, <u>expressly</u> reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is <u>necessarily</u> implied." <u>Berman v. Gurwicz</u>, 458 A.2d 1311, 1313-14 (N.J. Super. Ct. Ch. Div. 1981) (quoting John Norton Pomeroy, <u>A Treatise on Equity Jurisprudence</u> 902 (5th ed. 1941)). In short, "[t]he essence of a fiduciary relationship is that one

---

[7]      As Defendant points out, comment f to section 551 of the Second Restatement explains that "relations of trust and confidence include those of the executor of an estate and its beneficiary, a bank and an investing depositor, and those of physician and patient, attorney and client, priest and parishioner, partners, tenants in common and guardian and ward." <u>See</u> Restatement (Second) of Torts § 551 cmt. f (Am. Law Inst. 1977).

party places trust and confidence in another who is in a dominant or superior position." <u>Feldman</u> <u>v. Am. Asset Fin., LLC</u>, No. 2:14-CV-5267-CDJ, 2015 WL 4243548, at *8 (E.D. Pa. July 14, 2015) (quoting <u>Avon Bros., Inc. v. Tom Martin Const. Co.</u>, No. A–740–99 T1, 2000 WL 34241102, *4 (N.J. Super. Ct. App. Div. Aug. 30, 2000)). Generally speaking, "[a] typical business relationship does not form the basis for such a [confidential or fiduciary] relationship unless 'one party surrenders substantial control over some portion of his affairs to the other.'" <u>Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.</u>, 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999) (quoting <u>Drapeau v. Joy Tech., Inc.</u>, 670 A.2d 165, 171 (Pa. Super. Ct. 1996)); <u>see Diamond</u> <u>Energy, Inc. v. Carbon/Graphite Grp., Inc.</u>, No. 89-CV-910S, 1992 WL 225554, at *5 (W.D.N.Y. Aug. 11, 1992) (stating that under "the standard of common law . . . . a conventional business relationship does not create a fiduciary relationship in the absence of additional factors" (quoting <u>RKB Enters. Inc. v. Ernst & Young</u>, 582 N.Y.S.2d 814, 816 (N.Y. App. Div. 1992))). "Whether or not a confidential relationship exists in a given case is usually a question of fact to be determined by no inflexible rule but by a weighing of the particular factors present in that case." <u>Amendolia v. Rothman,</u> No. CIV.A. 02-8065, 2003 WL 23162389, at *4 (E.D. Pa. Dec. 8, 2003); <u>see also</u> 26 Richard A. Lord, <u>Williston on Contracts</u> § 69:17 (4th ed.) ("It is generally agreed that the existence of a confidential relationship sufficient to impose a duty not to suppress or conceal material matters, or of other particular facts sufficient to impose a duty to disclose, is a question of fact that depends on the surrounding circumstances, and is thus a matter for the jury or trier of fact.").

Here, the Complaint has not alleged the existence of a relation of trust and confidence, nor has Plaintiff alleged that it surrendered substantial control of its affairs to Defendant, or any other facts to support the existence of a relation of trust and confidence between the parties. Nor

has Plaintiff averred facts sufficient to plausibly allege that a duty of disclosure existed under

any other theory found in the common law.[8] Accordingly, Plaintiff has failed to state a claim for

fraud or negligent misrepresentation, and the Court will grant Defendant's Motion to Dismiss the

Complaint pursuant to 12(b)(6). The Court will permit Plaintiff leave to amend.[9]

**D.      The Court Will Dismiss Plaintiff's Equitable Estoppel Claim with Prejudice.**

As Defendant points out, "[e]quitable estoppel is not a cause of action, but a judicial

doctrine that bars the assertion of a claim or defense." Medley v. Cnty. of Montgomery, No.

CIV.A. 12-1995, 2012 WL 2912307, at *4 (E.D. Pa. July 17, 2012); see also Prusky v. Phoenix

Life Ins. Co., No. CIV.A. 02-6010, 2003 WL 1256225, at *6 (E.D. Pa. Mar. 4, 2003) (finding

that "neither Pennsylvania law nor the United States Court of Appeals for the Third Circuit

recognizes equitable estoppel as a separate cause of action").[10] Accordingly, the Court will

dismiss Plaintiff's equitable estoppel claim with prejudice.

**V.      Conclusion**

The Court finds that it has jurisdiction over the present dispute but that Plaintiff has failed

to state a claim upon which relief can be granted. The Court will therefore grant Defendant's

---

[8]       For example, in addition to the duty to disclose arising from a fiduciary or similar relation of trust and confidence, the Restatement (Second) of Torts recognizes that a party has a duty to disclose "matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading"; and "subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so"; and "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." See Restatement (Second) of Torts § 551(2) (Am. Law Inst. 1977).

[9]       Defendant also maintains that Plaintiff cannot show justifiable reliance. However, in this case whether the reliance was justified or reasonable involves a determination of factual matters that may not be properly resolved in this motion to dismiss. See EUSA-Allied Acquisition Corp. v. Teamsters Pension Trust Fund of Phila. & Vicinity, No. CIV.A. 11-3181, 2012 WL 1033012, at *5 (D.N.J. Mar. 26, 2012) (stating that "whether a plaintiff's reliance was 'reasonable' is a question of fact for the jury).

[10]      Courts in this district have occasionally construed equitable estoppel claims as asserting a claim for promissory estoppel, see Romeo v. Unumprovident Corp., No. CIV.A. 07-1211, 2008 WL 375161, at *6 (E.D. Pa. Feb. 11, 2008), but here Plaintiff does not allege that Defendant made a promise.

Motion to Dismiss, but will permit Plaintiff to amend its Complaint in accordance with this

Opinion. An appropriate Order follows.


BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

22