UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ELBECO INCORPORATED,                     :
                                         :
                    Plaintiff,           :
          v.                             :        No. 5:15-cv-00318
                                         :
NATIONAL RETIREMENT FUND,                :
                                         :
                    Defendant.           :
_____

## MEMORANDUM OPINION

### Defendant's Motion to Dismiss, ECF No. 26 – Granted

**Joseph F. Leeson, Jr.**                                  **July 19, 2016**
**United States District Judge**

### I.      Introduction

Defendant National Retirement Fund has filed a Motion to Dismiss Plaintiff Elbeco

Incorporated's First Amended Complaint. For the reasons that follow, the Court grants the

Motion and dismisses the Amended Complaint with prejudice.

### II.     Background

### A.      Statutory Background

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by

the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "the Act"), 29 U.S.C.

§§ 1381-1461, employers may make contributions to one or more pension plans on behalf of

their employees who belong to a participating union. *Flying Tiger Line v. Teamsters Pension*

*Trust Fund of Phila.*, 830 F.2d 1241, 1243 (3d Cir. 1987). "Congress enacted [the] MPPAA in

particular because it found that existing legislation 'did not adequately protect plans from the

1

adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans.'" *Id.* (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984)). The MPPAA "addressed this problem by assessing such employers with withdrawal liability, defined in the statute as the employer's adjusted 'allocable amount of unfunded vested benefits.'" *Id.* (quoting 29 U.S.C. § 1381(b)(1)). The MPPAA also includes provisions for the assessment and calculation of withdrawal liability and for the "quick and informal resolution of withdrawal liability disputes":

> The Act requires a plan's trustees to determine initially whether a withdrawal has occurred. 29 U.S.C. §§ 1382(1), 1399(b)(1)(A)(i) (1982). When the trustees conclude that a withdrawal has taken place, they must then notify the employer of the amount of liability and demand payment in accordance with an amortization schedule. 29 U.S.C. §§ 1382(2), 1382(3), 1399(b)(1)(B) (1982). Thereafter, the employer may within 90 days ask the trustees to conduct a reasonable "review" of the computed liability. 29 U.S.C. § 1399(b)(2)(A)(i) (1982). If a dispute remains, either party may initiate arbitration proceedings. . . . Finally, "[u]pon completion of the arbitration proceedings in favor of one of the parties," MPPAA permits "any party thereto" to bring an action "to enforce, vacate or modify the arbitrator's award" in the appropriate federal district court. 29 U.S.C. § 1401(b)(2) (1982).

*Id.* at 1244.

ERISA also includes provisions for employers to receive notices of their potential withdrawal liability, prior to withdrawing from a fund. Section 101 of ERISA, 29 U.S.C. § 1021, sets forth a pension plan's "duty of disclosure and reporting" with respect to plan participants, beneficiaries, the Secretary of Labor, employers, and other entities. With respect to employers in particular, § 1021(l) provides that "[t]he plan sponsor or administrator of a multiemployer plan shall, upon written request, furnish to any employer who has an obligation to contribute to the plan" a "notice of potential withdrawal liability." Specifically, the plan administrator is required to provide the following information:

(A) the estimated amount which would be the amount of such employer's withdrawal liability under part 1 of subtitle E of subchapter III of this chapter if such employer withdrew on the last day of the plan year preceding the date of the request, and

(B) an explanation of how such estimated liability amount was determined, including the actuarial assumptions and methods used to determine the value of the plan liabilities and assets, the data regarding employer contributions, unfunded vested benefits, annual changes in the plan's unfunded vested benefits, and the application of any relevant limitations on the estimated withdrawal liability.

29 U.S.C. § 1021(l). Any required notice of potential withdrawal liability must be provided to the requesting employer within 180 days after the request is made. *Id.*[1]

## B.     Factual Background and Procedural History

Plaintiff Elbeco Incorporated ("Elbeco"), a Pennsylvania corporation engaged in the uniform manufacturing business, filed its initial Complaint in this matter in January 2015, alleging claims of federal common law fraud, federal common law negligent misrepresentation, and federal common law equitable estoppel against Defendant National Retirement Fund ("the Fund"), a multiemployer pension fund that manages and administers a plan offering pension benefits to union members employed by Elbeco and other employers. ECF No. 1. Elbeco's

---

[1]     Section 1021(l) was enacted as part of the Pension Protection Act of 2006. 109 P.L. 280, 120 Stat. 780. Employers were formerly entitled to information concerning their potential withdrawal liability under 29 U.S.C. § 1401(e), which read as follows:

If any employer requests in writing that the plan sponsor make available to the employer general information necessary for the employer to compute its withdrawal liability with respect to the plan (other than information which is unique to that employer), the plan sponsor shall furnish the information to the employer without charge. If any employer requests in writing that the plan sponsor make an estimate of such employer's potential withdrawal liability with respect to the plan or to provide information unique to that employer, the plan sponsor may require the employer to pay the reasonable cost of making such estimate or providing such information.

This subsection was repealed in 2008. *See* Worker, Retiree, and Employer Recovery Act of 2008, 110 P.L. 458, 122 Stat. 5092, 5093.

Complaint alleged that the Fund violated its disclosure duties under federal common law when it failed to advise Elbeco of actuarial changes that greatly affected the amount of withdrawal liability imposed on Elbeco when it withdrew from the Fund in June 2014.[2]

In response to Elbeco's Complaint, the Fund filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), contending that the Court lacked subject matter jurisdiction over the case and that the Complaint failed to state a claim. *See* ECF No. 13. In a Memorandum and Order filed in September 2015, the Court determined that it had jurisdiction over this matter but granted the Fund's Motion to Dismiss under Rule 12(b)(6), finding that the Complaint failed to state a claim. ECF Nos. 21-22. Specifically, the Court determined that although Elbeco had contended that it was involved in a "relation of trust and confidence" with the Fund, giving rise to a duty of disclosure on the part of the Fund under federal common law, Elbeco had failed to allege any facts in support of this allegation, nor had Elbeco alleged facts sufficient to plausibly allege that a duty of disclosure existed under any other theory found in the common law. The Court therefore dismissed Elbeco's federal common law fraud and negligent representation claims, but granted Elbeco leave to amend its Complaint with respect to these claims.[3] Elbeco subsequently filed its Amended Complaint, ECF No. 23, again alleging claims of federal common law fraud and negligent misrepresentation. The Amended Complaint alleges the following facts.[4]

---

[2]  Pursuant to the MPPAA, Elbeco has also initiated arbitration proceedings with the American Arbitration Association ("AAA") regarding the withdrawal liability assessment. *See* Am. Compl. ¶ 44. After the present action was filed, the parties entered into a Stipulation for a stay of the AAA arbitration, subject to certain conditions. *See* Am. Compl. ¶ 45.

[3]  The Court dismissed with prejudice Elbeco's equitable estoppel claim, finding that no such cause of action existed in this context.

[4]  The Amended Complaint includes many of the same factual allegations as those included in the initial Complaint, which were summarized in the Court's previous Memorandum, *see* ECF No. 21. Nevertheless, in the interest of clarity and comprehensiveness, the Court will provide a

Elbeco began contributing to the Fund in 1972, pursuant to its collective bargaining agreement ("CBA") with two Joint Boards of the Workers United union ("the Union"), of which Elbeco's employees are members. Am. Compl. ¶¶ 5-8. David Lurio, Elbeco's president, "anticipated Elbeco's withdrawal from the Fund during the 2013 calendar year" in connection with negotiation of a new CBA with the Union. Am. Compl. ¶ 48. Accordingly, in November 2012, pursuant to Section 1021(l) of ERISA, Elbeco requested from the Fund an estimate of its withdrawal liability. Am. Compl. ¶ 54. The Fund responded in January 2013 with an estimate of $1,024,718. Am. Compl. ¶ 56. In May 2013, Elbeco requested an updated estimate of its withdrawal liability, to which the Fund responded in July 2013 with an estimate of $1,003,203. Am. Compl. ¶ 57.

Meanwhile, as part of Elbeco's negotiation of the new CBA, Elbeco advised union representatives Noel Beasley and Harold Bock, both of whom also served as trustees of the Fund, of its intentions to withdraw from the Fund. Am. Compl. ¶¶ 51-53, 58-59. The Amended Complaint alleges "[u]pon information and belief" that "the Fund, and specifically Beasley and Bock, knew at least by October 2013 that the withdrawal liability assessments against Elbeco would increase greatly for a withdrawal after 2013," due to a pending change in the interest rate assumption used to determine the value of the Fund. *See* Am. Compl. ¶¶ 67-68. However, "the Fund did not disclose this material information, which was a fact basic to the transaction, to Elbeco in 2013, or in fact, any time before Elbeco's agreement to withdraw from the Fund in mid-2014." Am. Compl. ¶ 69. Rather, Bock and Beasley engaged in "intentional delaying actions" that prevented Elbeco from withdrawing from the Fund before the end of 2013. Am. Compl. ¶ 60.

---

summary of the Amended Complaint's allegations, which will overlap somewhat with the summary included in the previous Memorandum.

In January 2014, Elbeco requested an updated withdrawal liability estimate from the Fund. Am. Compl. ¶ 72. In March 2014, while awaiting the estimate results, Elbeco forwarded to Bock and Beasley a proposed Memorandum of Understanding ("MOU") as part of the ongoing negotiations for a new CBA. Am. Compl. ¶ 74. The MOU provided that Elbeco "will no longer make contributions to the present National Retirement Pension Fund. The foregoing shall be subject to Elbeco's receipt and approval of the amount of withdrawal liability proposed to be assessed by the Fund." Am. Compl. ¶ 74. After receiving the proposed MOU, Beasley told Lurio that the Union could not sign the MOU with the protective language in it and that Lurio should take out the language. Am. Compl. ¶ 75. Beasley also told Lurio that Elbeco "should wait to receive the updated estimate of withdrawal liability prior to entering into the MOU" and that "if Elbeco was satisfied with the updated estimate, then the parties could enter into the MOU." Am. Compl. ¶¶ 76-77. Elbeco agreed to Beasley's suggestion to remove the language which protected Elbeco, and it advised the Fund's representative, David C. Sapp, "that per Beasley's suggested approach to resolving the withdrawal liability issue, as a condition to settling the negotiations for a new CBA, Elbeco was now waiting to receive the updated estimate from the Fund prior to entering into the MOU and withdrawing from the Fund." Am. Compl. ¶¶ 81-82.

On April 8, 2014, the Fund provided Elbeco with an updated estimate of $913,970. Am. Compl. ¶ 88. The following day, "[o]n the basis of the April 8, 2014 $913,970 estimate, as well as prior estimates provided by the Fund," Elbeco signed a revised MOU providing that Elbeco would withdraw from the Fund following ratification of the MOU by the Union. Am. Compl. ¶¶ 95-96. By early May 2014, the final MOU was ratified by the Union and signed by Beasley and Bock. Am. Compl. ¶ 99. On May 20, 2014, Sapp called Lurio and advised him that the Fund had changed its interest rate assumption from 7.5% to 3%, which would increase the withdrawal

liability substantially. Am. Compl. ¶ 102. "Despite the Fund's knowledge . . . that Elbeco was relying on the amount of the withdrawal liability estimate when Elbeco agreed to withdraw from the Fund," this was "the first time that Elbeco was given notice of the Fund's decision to change the interest rate assumption, change in actuary, or even that such a change was being considered by the Fund." Am. Compl. ¶ 103. On June 9, 2014, Sapp wrote to Elbeco, stating that the Fund had determined that Elbeco incurred a complete withdrawal from the Fund effective June 1, 2014, and that the estimated withdrawal liability assessment was $3,027,697.[5] Am. Compl. ¶ 105. At that point, Elbeco "was not able to change concessions it had made to the Union in connection with the Final MOU that was ratified by the Union." Am. Compl. ¶ 107.

The Amended Complaint also includes a number of additional allegations concerning the nature of the relationship between Elbeco and the Fund, including the following:

> 25. Under the circumstances, including the relationship between Elbeco and the Fund, Elbeco would reasonably expect a disclosure by the Fund to Elbeco that the Fund was contemplating a dramatic change or had dramatically changed its interest rate assumption which would significantly increase Elbeco's withdrawal liability.

> 26. The interest rate assumption is a fact basic to the withdrawal liability transaction and the interest rate assumption goes to the basis or essence of the withdrawal liability calculation.

> . . . .

> 31. Because Elbeco had no ability to determine its withdrawal liability other than the calculation provided by the Fund to Elbeco, Elbeco surrendered substantial control of its affairs to the Fund.

> 32. Elbeco and the Fund did not deal on equal terms since Elbeco had no control over: monies it contributed to the Fund; decisions regarding the Fund's investments; determination of interest rate assumption for the Fund; and calculations of Elbeco's withdrawal liability from the Fund.

---

[5]     This figure was later adjusted to $3,154,286. Am. Compl. ¶ 112.

33. Because the Fund is the only source for the withdrawal liability estimate, the Fund is in a relationship of trust and confidence with Elbeco.

34. Because Elbeco had contributed to the Fund for approximately forty-two years, and the Fund maintained control over Elbeco's contributions to the Fund, Elbeco developed a relation of trust and confidence with the Fund.

. . . .

113. Because of the relation of trust and confidence between the Fund and Elbeco, the Fund had a duty to disclose to Elbeco in 2013 that the Fund was changing actuary firms and that the interest rate assumption would dramatically change for 2014, and the Fund had a duty to advise Elbeco that its withdrawal liability would increase greatly for withdrawals after 2013.

114. Because of the relation of trust and confidence between the Fund and Elbeco, the Fund had a duty to disclose to Elbeco prior to Elbeco's entering into the Final MOU and withdrawing from the Fund, that the Fund had changed actuary firms and that the interest rate assumption had dramatically changed for 2014, and the Fund had a duty to advise Elbeco that its withdrawal liability would increase greatly as compared with the estimates which were based on the 2013 interest rate assumption.

115. Because of the relationship between Elbeco and the Fund, including the fact that Elbeco had no means to determine its estimated or actual withdrawal liability except from the Fund, Elbeco reasonably expected the Fund to disclose to Elbeco the fact that the Fund had changed actuary firms and its interest rate assumption, and the Fund had a duty to communicate this information to Elbeco prior to when the Final MOU was ratified in early May 2014 pursuant to which Elbeco agreed to withdraw from the Fund.

116. Because the Fund knew that the Fund had changed actuary firms and its interest rate assumption, the Fund's communications to Elbeco as to Elbeco's estimated withdrawal liability (which were based on the old interest rate assumption) were misleading, and the Fund had a duty to provide full information to Elbeco prior to when the Final MOU was ratified in early May 2014 pursuant to which Elbeco withdrew from the Fund.

117. Once the Fund knew that it was going to change actuary firms, and/or change the interest rate assumption, the Fund knew that this information made untrue or misleading the Fund's prior communications to Elbeco which were based on the 7.25% assumed interest rate that had been used for more than twenty years, and the Fund had a duty to provide full information to Elbeco prior to when the Final MOU was ratified in early May 2014 pursuant to which Elbeco withdrew from the Fund.

118. Since the Fund knew that Elbeco was withdrawing from the Fund and entering into the Final MOU based on Elbeco's mistaken understanding that the Fund was continuing to use the same or similar interest rate assumptions previously used, and due to the relationship between the Fund and Elbeco, including Elbeco's inability to obtain information about withdrawal liability from any source other than the Fund, Elbeco reasonably expected the Fund to disclose to Elbeco full information including the dramatic change in interest rate assumption.

Am. Compl. ¶¶ 25-26, 31-34, 113-118.

In response to the Amended Complaint, the Fund filed the present Motion to Dismiss, ECF No. 26, contending that despite the additional allegations included in the Amended Complaint, Elbeco has nevertheless again failed to state a claim for fraud or negligent misrepresentation.

## III.   Legal Standard - Motion to Dismiss under Rule 12(b)(6)

The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). This Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).

Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do." 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court subsequently laid out a two-part approach to reviewing a motion to dismiss under Rule 12(b)(6).

First, the Court observed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive the motion; "instead, 'a complaint must allege facts suggestive of [the proscribed] conduct.'" *Id.*; *Phillips*, 515 F.3d at 233 (quoting *Twombly*, 550 U.S. at 563 n.8). While Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," was "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79 ("Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citing *Twombly*, 550 U.S. at 555)); *see* Fed. R. Civ. P. 8(a)(2). For "without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." *Phillips*, 515 F.3d 224, 232 (citing *Twombly*, 550 U.S. at 555 n.3).

Second, the Court emphasized, "only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678. Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555). This is because Rule 8(a)(2) "requires not merely a

short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.'" *See id.*, 515 F.3d at 234 (quoting Fed. R. Civ. P. 8(a)(2)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Detailed factual allegations" are not required, *id.* at 678 (quoting *Twombly*, 550 U.S. at 555), but a claim must be "nudged . . . across the line from conceivable to plausible," *id.* at 680 (quoting *Twombly*, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement,'" but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557)).

Independent of the standard governing motions to dismiss under Rule 12(b)(6), Rule 9(b) imposes a heightened pleading standard with respect to a claim of fraud. The first sentence of the Rule states that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Thus, "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). However, in applying the first sentence of Rule 9(b), "courts must be sensitive to the fact that its application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud." *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 99–100 (3d Cir. 1983).

IV.    **Plaintiff has failed to state a claim upon which relief may be granted.**

The Fund contends that the Court should dismiss Elbeco's Amended Complaint for two primary reasons. First, the Fund contends that the Amended Complaint is deficient under Federal Rule of Civil Procedure 9(b) because Elbeco "fails to allege that the Fund even knew, in April 2014, that its interest rate assumptions would change." Def.'s Mem. 1, ECF No. 26-1. Second, "[e]ven assuming, *arguendo*, that [Elbeco] sufficiently alleged that the Fund knew of a change in interest rate assumptions in April 2014, its claims still fail because it has not established that the Fund had any duty to disclose that information." *Id.* at 2. The Court considers each of these contentions in turn.

A.    **Elbeco's allegations concerning the Fund's "knowledge" are sufficiently particular under Federal Rule of Civil Procedure 9(b).**

The Fund contends, first, that Elbeco "fails to plead, with particularity," its allegations that the Fund knew, when it provided the April 2014 estimate to Elbeco, that the interest rate applied to Elbeco's actual and final withdrawal liability would change, resulting in a material increase to Elbeco's withdrawal liability. Def.'s Mem. 11. The Fund contends that Elbeco's Amended Complaint "makes no allegations regarding who at the Fund knew of the change in interest rate assumptions, on what date they found out, how they found out, or even when the interest rate assumptions changed." *Id.* The Fund acknowledges that Elbeco alleges "[u]pon information and belief" that the Fund knew in October 2013 "about the change in interest rate assumption" and that "the Fund, and specifically Beasley and Bock, knew at least by October 2013 that the withdrawal liability assessments against Elbeco would increase greatly for a withdrawal after 2013." *See id.* at 12-13 (quoting Am. Compl. ¶¶ 67-68). Likewise, the Fund acknowledges that Elbeco alleges that the Fund "already knew" in March 2014 that the Fund's April 2014 estimate "would be vastly different from Elbeco's actual withdrawal liability." *Id.* at

12

13 (quoting Am. Compl. ¶ 84). However, the Fund contends that these and other allegations in the Amended Complaint concerning the Fund's knowledge are "conclusory and theoretical," and are therefore insufficient to support a claim of fraud. *Id.* at 13.

Elbeco alleges claims of common law fraud by omission and common law negligent misrepresentation by omission. In order to establish a common law fraud claim, a plaintiff must allege with particularity that: (a) the defendant made a misrepresentation to the plaintiff; (b) the misrepresentation made by defendant was fraudulent; (c) the misrepresentation was of a material fact; (d) the defendant intended that the plaintiff rely on the defendant's misrepresentation; (e) the plaintiff relied on the misrepresentation; and (f) the plaintiff's reliance on the defendant's misrepresentation was a substantial factor in bringing about the harm suffered by the plaintiff. *Fernander v. Amanze*, No. CIV.A. 02-603, 2007 WL 4083769, at *4 (E.D. Pa. Nov. 15, 2007). "An omission is actionable as a fraudulent misrepresentation where there is a duty to disclose." *Id.* Common law claims of negligent misrepresentation by omission likewise require a duty to disclose. *See In re Access Cardiosystems, Inc.*, 404 B.R. 593, 643 n.69 (Bankr. D. Mass. 2009) (observing that a "duty to disclose" requirement "is found in both common-law fraud and negligent representation" claims).

Federal Rule of Civil Procedure 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The United States Court of Appeals for the Third Circuit has observed that "[t]he purpose of [Rule 9(b)] is to allow a defendant to meaningfully respond to a complaint." *In re Docteroff*, 133 F.3d 210, 217 (3d Cir. 1997). More specifically, "Rule 9(b) serves to give defendants 'notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ]

13

the number of frivolous suits brought solely to extract settlements.'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). However, a claim of fraud by omission "necessarily involves less particularity in pleading than would the pleading of fraud based upon false statements: a plaintiff can plead a particular time, day, and place with regard to the latter, but not the former." *Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 958 F. Supp. 992, 1006 (E.D. Pa. 1997). With respect to negligent misrepresentation, "the majority of district courts within the Third Circuit have declined to apply [Rule 9(b)'s] heightened pleading standard to claims of negligent misrepresentation." *Cogswell v. Wright Med. Tech., Inc.*, No. 15-295, 2015 WL 4393385, at *5 (W.D. Pa. July 16, 2015).

Here, Elbeco has alleged numerous facts concerning the Fund's alleged fraud or negligent misrepresentation by omission, including the type of facts omitted (the change in interest rate assumptions), when the omitted facts should have been stated (prior to Elbeco's withdrawal from the Fund), and the way in which the omitted facts made the Fund's representations misleading (by leading Elbeco to believe that the amount of withdrawal liability would be approximately the same as the estimates earlier provided by the Fund). These allegations provide the Fund sufficient notice of the claims against them and provide sufficient information for the Fund to meaningfully respond to those claims. *See* 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 9.03 (3d ed. 2015) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, where the omitted facts should have been stated, and the way in which the omitted facts made the representations misleading."). Further, as Elbeco points out, the second sentence of Rule 9(b) expressly states that "knowledge . . . may be alleged generally." For these

reasons, Elbeco's failure to allege how the Fund's representatives found out about the change in interest rate assumptions, or the precise date on which they found out, is not fatal to Elbeco's claims of fraud by omission and negligent misrepresentation by omission.

**B.     Elbeco fails to plausibly allege that the Fund had duty to disclose under the federal common law of ERISA.**

The Fund contends that Elbeco's claims of fraud by omission and negligent misrepresentation by omission fail because the Fund "had no duty to disclose to Plaintiff information concerning a change or potential change to the interest rate assumptions that would ultimately be applied to its final withdrawal liability assessment." Def.'s Mem. 14. The Fund contends that a multiemployer pension plan's disclosure requirements are "a fundamental component" of ERISA, which sets forth "the specific information multiemployer pension plans are required to provide employers," as well as instructions to multiemployer plans "as to when they are required to provide that information, under what circumstances, and in what format." Def.'s Mem. 15 (citing  29 U.S.C. § 1021(l)). Further, the Fund contends that ERISA's instructions concerning the disclosure requirements of pension funds do not leave any "gap" into which courts might supply further requirements under federal common law. Def.'s Mem. 16. Accordingly, the Fund contends that ERISA "preempts claims based on any duties that could exist under common law for multiemployer pension plans to disclose information relating to an employer's withdrawal liability estimates or assessments." Def.'s Mem. 17.

The Fund further contends that even if disclosure duties beyond those set forth in ERISA could be imposed on pension plans under common law, Elbeco has failed to allege that the Fund had any such duty to disclose information about its interest rate assumptions in this case. Def.'s Mem. 17. In this respect, the Fund contends that Elbeco has failed to allege any facts to show that the Fund was in a fiduciary relationship with Elbeco or even a relationship similar to that of

15

a fiduciary relationship. Def.'s Mem. 18. Finally, the Fund contends that Elbeco has failed to plausibly allege that it justifiably relied on an omission by the Fund when each of the estimates that the Fund supplied to Elbeco contained warnings that Elbeco's actual and final withdrawal liability could be "materially different" from the estimates. Def.'s Mem. 20.[6]

In response, Elbeco contends that it has sufficiently alleged that the Fund had a common law duty to disclose under subsections 2(a), 2(b), 2(c), and 2(e) of section 551 of the Restatement of Torts (Second), which reads in its entirety as follows:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

>> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

>> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

>> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

---

[6]     For example, the cover letter of the April 2014 estimate stated:

> The actuarial assumptions and methodology used to calculate the estimate were the actuarial assumptions used to calculate withdrawal liability for employers withdrawing during the plan year ending December 31, 2013. The actuarial assumptions and methodology used to calculate [Elbeco's] actuarial withdrawal liability for a withdrawal during the plan year ending December 31, 2014, and subsequent years, may be different than those used for this estimate. This may cause [Elbeco's] withdrawal liability to be materially different than this estimate.

Am. Compl. Ex. 3.

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551 (Am. Law Inst. 1977).

Specifically, Elbeco contends that the Fund had a duty to disclose under subsection 2(a) "[b]ecause of special circumstances involving multiemployer pension plans, and Elbeco's inability to obtain information from any source other than the Fund," as a result of which "there was a special relationship between the Fund and Elbeco." Pl.'s Mem. 5, ECF No. 29. Similarly, Elbeco contends that the Fund had a duty to disclose under subsection (2)(e) "since the amount of the withdrawal liability was a fact basic to Elbeco's . . . withdrawal from the Fund" and "[t]here were special circumstances since Elbeco had no way of determining its withdrawal liability, and the only source for this information was the Fund." Pl.'s Mem. 5. Elbeco also contends that the Fund had a duty to disclose under subsection 2(b), "since the Fund failed to communicate information to Elbeco which was known to the Fund and which was necessary to prevent the Fund's withdrawal liability estimates from being misleading," and under subsection 2(c) because "the Fund had a continuing duty to disclose information that it knew would make untrue or misleading the previous estimates of withdrawal liability." Pl.'s Mem. 6.

"In certain areas, Congress has authorized the federal courts to create common law. . . . ERISA is such an area." *Plucinski v. I.A.M. Nat. Pension Fund*, 875 F.2d 1052, 1056 (3d Cir. 1989) (citations omitted). In cases in which a court is asked to exercise this lawmaking power, "the inquiry is whether the judicial creation of a right in this instance is 'necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in the large by Congress.'" *See*

17

*Plucinski v. I.A.M. Nat. Pension Fund*, 875 F.2d 1052, 1056 (3d Cir. 1989) (quoting *Van Orman v. American Insurance Co.*, 680 F.2d 301, 312 (3d Cir. 1982)). The Third Circuit "has observed that Congress has established through ERISA 'an extensive regulatory network,' and that 'federal courts [should] not lightly create additional [ERISA] rights under the rubric of federal common law.'" *Plucinski v. I.A.M. Nat. Pension Fund*, 875 F.2d 1052, 1056 (3d Cir. 1989) (quoting *Van Orman v. American Insurance Co.*, 680 F.2d 301, 312 (3d Cir. 1982)).

The Third Circuit has, however, "previously recognized several federal common law actions pursuant to ERISA." *Id.* at 1056. For example, as discussed in this Court's previous Memorandum, in *Carl Colteryahn Dairy, Inc. v. West Pennsylvania Teamsters & Employers Pension Fund*, 847 F.2d 113 (3d Cir. 1988), the Third Circuit recognized a federal common law claim by an employer alleging that its pension fund, trustees, and others employed by the fund misrepresented the status of the pension fund when it merged with another fund, and thus fraudulently induced the employer to accede to and approve the merger. The employer alleged that the fund fraudulently failed to disclose large unfunded liabilities that predated the merger. *Id.* at 117. The employer then withdrew from the fund but was imposed a large withdrawal liability assessment. *Id.* The employer stated that it would not have approved the merger had it known of the unfunded liabilities and that the withdrawal liability assessment consisted of primarily pre-merger undisclosed liabilities. *Id.* at 121 n.13. The court held that the employer could sue in federal court, under the federal common law of pension plans, for the return of any withdrawal liability sums assessed as a result of the fraudulent inducement to join the fund. *Id.* at 122.

The *Colteryahn* court held that the axiom that "as a general rule, a party should not be allowed to profit from its own wrongs" is "particularly apposite when dealing with federally

regulated pension plans," in light of the "equitable character" of these plans. *Id.* at 121. The court also observed that it "would find it quite curious if Congress had given multiemployer plans the immense power" of "assess[ing] upon a withdrawing employer a substantial penalty while providing the employer with few defenses—yet did not intend to place some check on the conduct and practices of such plans." *Id.* Further, the court stated:

> [W]e doubt that Congress intended that innocent employers, penalized by the fraudulent exercise of such powers, would be without remedy. Finally, given the predominant federal interest in the conduct of pension plans' affairs, any check on such power must be available in federal court.

*Id.* at 121-22.

Here, Elbeco seeks to have the Court use its lawmaking powers to recognize a claim of fraud or negligent misrepresentation by omission against the Fund, thereby imposing on the Fund a duty to disclose information about Elbeco's potential withdrawal liability over and above the Fund's duty under ERISA to provide Elbeco with an annual "notice of potential withdrawal liability" at Elbeco's request. In its previous Memorandum, the Court did not foreclose the possibility that such a cause of action might exist in circumstances where an employer was able to show that it was in a relationship of "trust and confidence" with a fund, or in other circumstances giving rise to a common law duty to disclose. Here, however, Elbeco has failed allege any facts to show the Fund had any such duty.

Elbeco rests its claim that the Fund had a common law duty to disclose primarily on the basis of its allegation that Elbeco was in a "special relationship" with the Fund because the Fund was "[t]he only source for the amount of the withdrawal liability." Pl.'s Mem. 5; *see also id.* at 7 (stating that "[t]he facts in this case are unique" because "Elbeco had no independent means to determine its withdrawal liability as the calculation was within the Fund's exclusive control"). However, as set forth above, ERISA contemplates that multiemployer pension funds may

possess information about contributing employers' "potential withdrawal liability" that employers lack, and the statute provides for a procedure by which employers can submit a written request to pension funds in order to obtain limited information about their potential withdrawal liability—namely, "the estimated amount which would be the amount of such employer's withdrawal liability . . . if such employer withdrew on the last day of the plan year preceding the date of the request," along with an explanation of how this estimated liability amount was determined. *See* 29 U.S.C. § 1021(l).[7] Accordingly, the set of circumstances alleged by Elbeco—in which it lacked information about its potential withdrawal liability and requested and received from the Fund the information to which it was entitled under ERISA—was by no means special or unique, but rather is the situation contemplated by and provided for in ERISA. For this reason, Elbeco's allegation that the Fund was the only source of information concerning the amount of its withdrawal liability does not plausibly allege that there was a "fiduciary or other similar relation of trust and confidence between" Elbeco and the Fund, *see* Restatement (Second) of Torts § 551(2)(a), or that because of "the relationship between them, the customs of the trade or other objective circumstances," *see id.* § 551(2)(e), Elbeco would reasonably expect the Fund to disclose the change in interest rate assumptions. Nor has Elbeco alleged any other facts about the relationship between it and the Fund, "the customs of the trade[,] or other objective circumstances" to support its claim that the Fund had a duty to disclose the change in interest rate assumptions. Accordingly, Elbeco fails to state a clam under subsections 551(2)(a) and (e).

---

[7]     As discussed above, this particular mechanism was enacted in 2008. Prior to that, funds were required to, at the employer's request, make available to the employer "general information" necessary for the employer to compute its withdrawal liability with respect to the plan without charge and to, at the employer's expense, "make an estimate of such employer's potential withdrawal liability with respect to the plan or to provide information unique to that employer."

Elbeco also contends that the Fund had a duty to disclose the change in interest rate assumptions because this information constituted, under subsection 551(2)(b) of the Restatement (Second) of Torts, "matters known to [the Fund] that [it] knows to be necessary to prevent [its] partial or ambiguous statement of the facts from being misleading" and, under subsection 551(2)(c), "subsequently acquired information that [the Fund knew would] make untrue or misleading a previous representation that when made was true or believed to be so." The previous statements or representations in question are the previous estimates of withdrawal liability provided by the Fund pursuant to its responsibilities under ERISA. *See* Pl.'s Mem. 34. Pursuant to the statute, these estimates were not statements about present or future conditions but rather were statements about the past, that is, statements about what Elbeco's withdrawal liability would have been if Elbeco had withdrawn from the Fund "on the last day of the plan year preceding the date of the request."[8] Assuming these statements accurately represented what Elbeco's withdrawal liability would have been if Elbeco had withdrawn from the Fund "on the last day of the plan year preceding the date of the request" (Elbeco has not alleged otherwise), the statements were still accurate at time Elbeco withdrew from the Fund and, indeed, are still accurate today—precisely because they are statements about the past. There is therefore no basis

---

[8]     By contrast, the Second Restatement presents the following example illustrating the principle contained in section 551(2)(c):

> A, a stock breeder, tells B, a prospective buyer, that a thoroughbred mare is in foal to a well-known stallion. The mare miscarries. Immediately afterwards B offers $500 for the mare relying, as A knows, upon his statement. A does not inform B of the mare's miscarriage. A is subject to liability to B for the loss that he suffers because the mare is not in foal as originally represented.

Restatement (Second) of Torts § 551 cmt. h, illus. 1. In this example, unlike in the present case, the speaker made a statement about a present state of affairs; when later events altered that state of affairs, the statement became "untrue or misleading."

to conclude that these estimates were "partial," "ambiguous," or "untrue or misleading," and Elbeco has accordingly failed to state a claim under subsections 551(2)(b) and (c).

## V.      Conclusion

Elbeco has failed to allege facts to support its claim that the Fund had a duty under the federal common law of pension plans to disclose to Elbeco the change in interest rate assumptions. Elbeco therefore fails to state a claim for fraud by omission or negligent misrepresentation by omission, and the Court grants the Fund's Motion to Dismiss.

District courts must permit a curative amendment to dismissed complaints under Rule 12(b)(6), unless such amendment would be inequitable or futile. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004). "Futility" means that the amended complaint would fail to state a claim upon which relief could be granted. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (citing *In re Burlington Coat Factory Sec. Litig*, 114 F.3d 1410, 1434 (3d Cir. 1997)). Elbeco has already amended its complaint against the Fund once. Because, in light of the deficiencies in the Amended Complaint, further amendment would be futile, the Court dismisses Elbeco's Amended Complaint with prejudice. A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

22